# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| JENNELL GUILLORY | * | CIVIL ACTION NO. 08-0534 |
| VERSUS | * | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Jennell Guillory, born March 5, 1960, filed an application for a period of disability and disability insurance benefits on August 18, 2004, alleging that she became disabled on December 17, 1999, due to back problems.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Lake Charles Memorial Hospital dated March 18, 1999 to October 12, 2000**.  An MRI of the lumbar spine dated March 18, 1999 was normal. (Tr. 123).  Doppler venous ultrasound of the left leg dated January 4, 2000, was normal.  (Tr. 120).  A bone scan taken on October 12, 2000, showed a mild increase in uptake in the right SI joint region, but was otherwise negative. (Tr. 119).

**(2) Records from Center for Orthopaedics dated October 28, 1999 to January 26, 2004**.  Claimant complained of back spasm on October 28, 1999.  (Tr. 133).  Her neurologic exam was stable.  EMG nerve conduction study did not reveal any peripheral neuropathy.  Dr. James Perry recommended continued conservative treatment, including Neurontin, and continued claimant on light duty.

On May 5, 2000, claimant complained of lower back pain. (Tr. 130).  He did not recommend surgical treatment.  (Tr. 132).  He assessed a 10% permanent partial impairment rating.  He recommended a light duty job with no strain on claimant's back.

On January 26, 2004, claimant continued to complain of lower back and left leg pain.  (Tr. 124).  Dr. Perry did not recommend any surgical procedure, including a discogram.  (Tr. 126).

**(3) Records from Bernauer Clinic dated December 22, 1999 to July 19, 2004**.  On December 22, 1999, claimant reported hurting her back after a fall while working for home health.  (Tr. 169).  She went back to work at light duty, then was laid off.  She complained of left leg and left shin numbness.  Examination showed decreased range of motion in the lumbar spine and left leg swelling.

On January 21, 2000, Dr. Bernauer reported that Doppler Ultrasound was negative for deep vein thrombosis.  (Tr. 167).  A lumbar MRI was within normal limits.  (Tr. 166, 170).  She was referred for physical therapy.

On April 24, 2000, claimant continued to complain of back pain and spasms. (Tr. 163).  Dr. Bernauer referred her to pain management.  On September 13, 2000, she reported that epidural steroid injections were of some help.  (Tr. 159, 171).

After claimant continued to complain of pain, Dr. Bernauer recommended a diskogram on October 11, 2000.  (Tr. 158).  On April 9, 2001, claimant reported that she had been in a motor vehicle accident on April 3, but had had no real increase in pain.  (Tr. 155).  The diagnosis was a herniated nucleus pulposus of the lumbar spine.[1]

---

[1]At various points in Dr.  Bernauer's notes (December 22, 1999, January 21, 2000, February 11, 2000, March 3, 2000, April 4, 2000, July 3, 2000, October 11, 2000, and November 13, 2000) the diagnosis appears as "HNP" and at other times the diagnosis is shown as lumbar strain.  On February 11, 2000, the HNP diagnosis appears in the same office note that recognizes an MRI was read as normal.  There is absolutely no objective diagnostic test result in this record which shows HNP, "herniated nucleus pulposus".

3

On June 2, 2003, Dr. Bernauer reported that a repeat MRI done May 3, 2003, was within normal limits. (Tr. 146, 322). Claimant had not been approved for a diskogram. She was also having pain at the sacroiliac joint.

On December 8, 2003, she complained of back spasms and losing bladder control. (Tr. 141). An EMG was positive at L5-S1 for very mild radiculopathy on the left side. (Tr. 333-34).

A diskogram performed by Dr. Renée Melfi on May 13, 2004, was negative. (Tr. 135, 335-39). Dr. Bernauer recommended that claimant continue with pain management. (Tr. 135).

**(4) Records from Gulf Coast Pain Institute dated May 18-June 15, 2000**. On May 18, 2000, claimant complained of lower back pain. (Tr. 173). On examination, she had normal range of motion in her back and a negative straight leg raise. She had normal range of motion of the extremities. Neurological exam was normal.

The diagnoses were chronic lumbosacral strain, lumbar intervertebral disc disease at the L5/S1 level, SI joint strain, and depression. Dr. Christopher Y. Lew recommended an SI joint block and prescribed Effexor. (Tr. 174).

**(5) Records from Dr. Lew dated June 29, 2000 to September 9, 2004**. On June 29, 2000, claimant complained of low back pain. (Tr. 245). SI joint injections

4

had helped her pain for about four days, then the pain returned.  Flexeril had helped her muscle spasms and pain, while Effexor had improved her depressive symptoms. Dr. Lew's diagnoses were lumbar radiculopathy, chronic lumbosacral strain, and depression.  He recommended injections and a psychological evaluation.

Claimant underwent a series of injections.  (Tr. 177, 178, 199, 206, 207, 212, 213, 214, 231, 237, 240, 243).  She had improvement with injections.  (Tr. 234, 235, 236, 238, 239).  A bone scan showed some irritation in the right SI joint.  (Tr. 235).

On February 22, 2001, claimant had increased thoracic kyphosis and diffuse lumbar tenderness on spinal exam.  (Tr. 229).  Dr. Lew's impression was chronic lumbosacral strain and lumbar radiculopathy, psychological factors affecting claimant's physical condition, and hypertension.  He tapered her off the Effexor.

Claimant reported on April 5, 2001, that she had been in a motor vehicle accident on April 3.  (Tr. 226).  She complained of back pain and depression.  The diagnosis was lumbar radiculopathy, depression, and motor vehicle accident with cervical strain.

On November 29, 2001, claimant complained of pain in her right lower back and episodic left leg numbness.  (Tr. 218).  A myelogram and post-mylogram CT were normal.  (Tr. 267-68).  She had some altered sensation in the left leg, and reduced Patella reflexes.

5

Claimant reported having a flare up of her back and neck pain on August 15, 2002.  (Tr. 205).  She continued to have difficulty sleeping and anxiousness.  Her Remeron was increased.  She was using a cane at her appointment on August 29, 2002.  (Tr. 204).

On May 29, 2003, Dr. Lew reported that claimant's brain MRI, EEG, and lumbar MRI were normal.  (Tr. 195).  She continued with headaches, low back pain, depression, and anxiety.  The impressions were sacral iliac pain, chronic lumbosacral strain, chronic pain syndrome, headaches, and depression.

Claimant continued with pain in her back on June 17, 2004.  (Tr. 180).  She had some benefit with medications, but little else.  Her diagnoses were chronic lumbar strain with facet joint dysfunction, sacral iliac pain, a negative discogram, and psychological factors affecting physical condition.

**(6) Independent Medical Evaluation by Dr. Clark A. Gunderson dated July 20, 2000 to April 2, 2004**.  On July 20, 2000, claimant complained of pain in the lower back radiating into both hips and thighs, as well as spasms.  (Tr. 250).  Her pain was aggravated by bending.

On examination, claimant could dress and undress without difficulty.  Her posture and gait were normal.  She could bend over and reverse her lumbar curvature so her fingertips were three inches from the floor.  Motor and reflex examination in

6

the lower extremities was normal.  Claimant had tenderness about L5.  Straight leg raises caused thigh pain at 60 degrees bilaterally.  (Tr. 251).

Dr. Gunderson's impression was that claimant would not benefit from any further electrothermy or surgical procedure.  He opined that she should undergo a Functional Capacity Evaluation, and return to modified duty within her capabilities.

On April 2, 2004, Dr. Gunderson noted that claimant had multiple injections, which had not afforded her any significant relief.  (Tr. 247).  She continued to complain of pain in her lower back radiating down both legs, particularly on the left, with numbness and tingling in her feet. (Tr. 248).  On examination, claimant could dress and undress without difficulty.  Her posture and gait were normal.  She could walk on her toes and heels.  Only one of the five Waddell signs was positive.

Claimant could bend over so her fingertips were 12 inches from the floor.  She had normal strength and reflexes in the lower extremities.  She had diminished sensation in the S1 dermatome on the left.  She had tenderness throughout the lower lumbar region from L3 to S1, and in the left sacroiliac and sciatic notch regions.  Straight leg raising caused hip pain bilaterally at 40 degrees, and was negative at 90 degrees seated.

The lumbar MRI dated May 9, 2003, which showed degenerative changes at the lowest disc where she had previously had the IDET procedure.  She had multiple

7

problems, the first and foremost being that she had been out of work for five years. The other complicating factor was the abnormal psychodynamics.

Dr. Gunderson recommended that an independent radiologist perform a discogram.  He did not recommend another IDET procedure.

**(7) Functional Capacity Evaluations ("FCE") from Advanced Rehab Services dated October 9, 2000 and November 2, 2004**.  Claimant's past work as a home health aide for St. Patrick's Hospital was classified as medium.  (Tr. 254). Based on the FCE results, she was in a DPL category of sedentary.

In the repeat FCE, claimant improved to sedentary/light work.  (Tr. 342-44). Claimant demonstrated a slight improvement in material handling.  (Tr. 344).  Some inconsistencies were noted during testing.  (Tr. 344, 355).  Therefore, the report was representative of what the patient was willing to demonstrate, and was "not necessarily reflective of actual capabilities."  (Tr. 344).

**(8) Records from Lafayette Bone and Joint Clinic dated May 20, 2002**. Claimant complained of lower back pain after a work-related injury on January 27, 1999.  (Tr. 273).  She complained of burning and stabbing in her back, pain in her tailbone area, increased pain with driving, radiation into the left leg with numbness and spasms, her left leg giving way, and difficulty sleeping due to pain.

8

On examination, claimant was 5 feet 8 inches tall, and weighed 220 pounds. (Tr. 274).  She had normal posture.  Range of motion was essentially full.  DTRs were 2+ and equal.  Motor and sensory function was normal.  Claimant had no weakness in the lower extremities.  Straight leg raise testing was negative.

Dr. John Cobb's impression was anterior column failure at L5-S1 with non-radicular referred pain in the left leg; lumbar instability; post IDET at L5-S1 with no relief of the anterior column symptoms; possible disc-related condition, and post-traumatic lumbar pain syndrome.  (Tr. 275).  He recommended discography at L5-S1.

**(9) Pain Coping Skills Progress Report from Medical Psychology Consulting – John Boutté, Ph.D. dated January 9, 2003 to July 22, 2004**. Claimant reported on January 9, 2003, that she had burned pots on the stove twice and was still hearing things.  (Tr. 319).  She was alert, oriented, and attentive with normal psychomotor behavior.  Her mood was dysphoric and anxious.  Her thinking process was goal-directed and reality-oriented with no evidence of thought disturbance.  Her speech was clear, coherent, and spontaneous.  Perception was intact.

Dr. Boutté's impression was pain disorder with psychological factors due to chronic pain, major depression, and anxiety disorder due to a general medical

9

condition.  (Tr. 321).  He recommended continued treatment for chronic pain and cognitive-behavioral therapy.

On May 1, 2003, Dr. Boutté performed a Psychological Pain Evaluation.  (Tr. 305).  At that time, claimant reported that her lower back pain was constant, and that sitting and standing exacerbated the pain.  Medication provided moderate pain relief.  The pain was associated with depression and anxiety.

Results of the current psychological pain evaluation revealed continued behavioral, clinical, and psychometric evidence of depression, anxiety, and functional restrictions due to pain.  (Tr. 309).  Claimant's diagnoses were pain disorder associated with both psychological factors and a general medical condition; major depression, severe severity, with suicidal preoccupation; anxiety disorder due to a general medical condition, and rule out psychosis with MMPI-.  (Tr. 310).  Her Global Assessment of Functioning ("GAF") score was 51, with the highest being 55 in the past year.  Dr. Boutté opined that claimant would benefit from continued anti-depressive and anti-anxiety medication, and was an appropriate candidate for conservative medical pain management.  He also recommended the MMPI-II for diagnosis clarification, and to rule out symptom magnification and psychosis.  (Tr. 311).

**(10) Psychological/Pain Evaluation by Kevin J. Bianchini, Ph.D., dated June 3, 2003**. Claimant complained of concentration and memory problems, coping, limited housework, trouble focusing, hallucinating, and consistent lower back and leg pain. (Tr. 324-25). She was taking Clonazepam-Klonopin, Paxil, Diazepam, and Vicodin.

Administration of the WAIS-II revealed a verbal IQ score of 69, performance IQ of 68, and full-scale IQ of 66. (Tr. 328). This placed her in the extremely low range of functioning. (Tr. 329). The MMPI-II yielded a normal profile without evidence of exaggeration or malingering. (Tr. 331). On the Personality Assessment Inventory, there were suggestions of somatization and long-standing interpersonal difficulties and problems that were difficult to interpret in a more specific matter.

In summary, Dr. Bianchini recommended that claimant receive additional pain coping skills treatments. (Tr. 332). Given Dr. Boutté's finding of somatization on his evaluation and the current one, Dr. Bianchini noted that it would be important not to reinforce a perception of disability, but rather to encourage her to function as independently as possibly, including in the vocational realm. He also observed that the FCE contained somewhat contradictory information. He concluded that claimant was not disabled from a psychological perspective and, thus, was capable of returning to any job for which she was qualified.

11

**(11) Psychological Evaluation by Lawrence Dilks, Ph.D., dated December 8, 2004**.  Claimant's affect was blunted and shallow, and her mood was mildly depressed.  (Tr. 359).  Attention, concentration, pace, and persistence were unremarkable.  She made many complaints about chronic pain, but her features were minimal.  She also complained of depression and anxiety.  (Tr. 360).  Her medications included Diazepam, Paroxetine, Hydrocodone APAP, and Licoderm Patch.

On mental status exam, claimant was alert and generally coherent.  (Tr. 361).  Mental organization was goal-oriented, thought content was appropriate, and processing was unremarkable.  Her affect was full, and her mood was somewhat anxious.  She was oriented as to time, place, person, and situation.  Memory was unimpaired.  Insight was a little weak, but reasoning appeared to be appropriate.

The MMPI-II resulted in an invalid profile with an F score of greater than 120. This score was frequently associated with an excessive exaggeration of symptoms. The validity of claimant's presentation was somewhat questionable.  During the course of the evaluation, she was administered the Fifteen-Item test, a measure of malingering, which she failed to successfully complete.  Secondary gain could not be ruled out as an issue.

12

The diagnoses were depression, NOS, mild; chronic pain disorder, mild, by client history, and avoidant personality features.  (Tr. 362).  Her GAF score was 65.

Dr. Dilks determined that, with appropriate vocational training, individual counseling, and medical supervision, claimant had a fair prognosis.  She could understand instructions, relate to others, sustain attention, tolerate stress, and sustain activities.  She did not appear to be in need of close supervision.  She attested to very extensive daily activities, including tending to her personal hygiene, dressing herself, driving, cooking, doing dishes, helping with laundry, folding clothes, shopping at Wal-Mart, watching television, attending church, using a telephone, going grocery shopping, managing money and her checking account, sweeping, vacuuming, mopping, visiting family members, reading, and walking up to 50 yards.  She indicated that she could drive to the store for a soft drink, then drive home.  Considering all of the above information, Dr. Dilks believed there was no psychological reason why claimant could not acquire some form of gainful employment.  She appeared to be capable to continue to manage her own financial affairs.

**(12) Mental Residual Functional Capacity Assessment dated January 13, 2005**.  The medical consultant found that claimant was moderately limited as to her ability to maintain attention and concentration for extended periods and interact

appropriately with the general public.  (Tr. 363-64).  Overall, she had the mental ability to meet the requirements of simple, unskilled work activities.  (Tr. 365).

**(13) Psychiatric Review Technique ("PRT") Form dated January 13, 2005**.  Claimant was assessed for affective mental disorders under § 12.04 of the Listings.  (Tr. 367).  She was moderately limited as to difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  (Tr. 377).

**(14) Report from Dr. Scott Mills dated June 6, 2006**.  A lumbar MRI was normal.  (Tr. 383).

**(15) PRT dated July 7, 2006**.  Dan Hamill, Ph.D., assessed claimant for affective disorders under § 12.04 and for somatoform disorders under § 12.07 of the listings.  (Tr. 387).  He found that claimant had a mild degree of limitation as to activities of daily living and difficulties in maintaining social functioning. (Tr. 397).  She had moderate difficulties in maintaining concentration, persistence, or pace.  She had no repeated episodes of decompensation.

**(16) RFC – Mental dated July 7, 2006**.  Dr. Hamill determined that claimant was moderately limited as to her ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, accept instructions and respond appropriately to criticism from

supervisors, and respond appropriately to changes in the work setting.  (Tr. 399-400).

**(17) Psychological Evaluation by Jerry L. Whiteman, Ph.D., dated October 13, 2006**.  Claimant had adequate orientation in all spheres.  (Tr. 404).  She sometimes felt useless and had suicidal ideation, but had not made any suicidal gestures.  She suffered from middle insomnia.  She was edgy, based on self-report.  She lost her temper about two times a week, and had a tendency to become upset rather easily.

Claimant had two friends with whom she enjoyed talking on the phone or going out to eat.  Her general fund of information and long-term memory skills were age-appropriate.  She had the mathematical skills necessary to manage her personal finances.

Claimant's judgment and insight were sometimes impulsive, and she failed to recognize some of the needs of others.  Her short-term memory and concentration skills, based upon digit span techniques, were adequate.

Claimant's responses to the MMPI-II were questionable, because they might have been invalid.  Her responses revealed that she had limited personal resources for coping with problems.  (Tr. 405).  She was experiencing moderate to severe emotional distress characterized by dysphoria, anger, and anhedonia.  She was often

depressed, sad, and had a possibility of suicidal ideation.  She was inclined to develop physical symptoms in response to stress, and might use her complaints to avoid responsibility.

Dr. Whiteman's impression was bipolar disorder, depressed, provisional; avoidant personality, and obesity, high blood pressure, high cholesterol, and borderline diabetes.  Her cognitive abilities were within normal limits for her age. Her responses to the MMPI-II suggested the possibility of exaggeration and distortion in order to obtain secondary gain.  However, she might also have been endorsing the number of complaints in order to emphasize her problems.  Dr. Whiteman opined that her prognosis was guarded, because her anger and brooding made it difficult to develop a therapeutic alliance.

**(18) Claimant's Administrative Hearing Testimony**.  At the hearing on July 7, 2006, the following colloquy transpired between the Administrative Law Judge ("ALJ") and claimant:

ALJ:      Ms. Guillory, I received a statement from you that you understood your rights to be represented by an attorney, and you agreed to waive your right to that attorney, and that is your signature, is that right:

CLMT:    Yes, sir.

ALJ:       Okay. And signed today's date.  Now I will admit it into

           evidence as Exhibit B37.

                              ***

ALJ:       [The issues] get a little complicated, and that is one reason

           why I recommend people to get an attorney, if they would

           like to have one.  Have you tried to get an attorney?

CLMT:      Well, yes, sir.

ALJ:       Okay.   Well, I'm going to go ahead and accept your

           waiver, and go ahead with the hearing.

(Tr. 409-10).

As to complaints, claimant testified that she had three discs which had

deteriorated.  (Tr. 410).  She stated that she went once a month to get four injections,

was on four different medications, and used a back stimulator three times a day.

Regarding limitations, claimant testified that she could not lift more than 10

pounds.  (Tr. 411, 421).  She said that she could stand for 15 or 20 minutes, and sit

for 20 minutes.  (Tr. 422).  She also stated that her medications made her sleepy.

(Tr. 411).  She reported that she was taking Valium, Vicodin, Paxil, and a patch.

Claimant testified that she had stopped working on December 17, 1999, after

getting hurt.  (Tr. 412).  She stated that she had gone back to work after three

months, but was terminated because no more light work was available.  (Tr. 413).

She reported that she was still getting $153.26 per week for worker's comp.  (Tr.

414).

Regarding activities, claimant testified that she drove.  (Tr. 415).  She stated

that she went to the grocery store, but her legs tired easily and her left leg gave out

on her.  She stated that she got a little relief from the steroid injections.  (Tr. 416).

Additionally, claimant testified that she had depression and anxiety, for which

she took Paxil twice a day.  (Tr. 418).  She stated that she did not watch too much

television, and read about 20 minutes at one time.  (Tr. 418-19).  She also washed

dishes, vacuumed, straightened her bed, folded clothes, and ironed.  (Tr. 419, 422).

Additionally, she went to church every Sunday.  (Tr. 419, 421).

**(19) Administrative Hearing Testimony of Dr. Dan Hamill, Medical**

**Expert ("ME")**.  Dr. Hamill testified that claimant suffered from a depressive

disorder, not otherwise specified, moderate to mild.  (Tr. 424).  He also said that she

suffered from a somatoform disorder.  (Tr. 425).  Her GAF score was 51 to 65, which

imposed some moderate limitations, but not enough to preclude activity.  (Tr. 425-

26).

**(20) Administrative Hearing Testimony of Cecile Johnson, Ph.D.,**

**Vocational Expert ("VE")**.  Ms. Johnson testified that claimant had past work

experience as an aide, which was medium in exertional level with an SVP of 3.  (Tr. 428).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant, age 46, with a 12th-grade education and the ability to read and write; with the mental limitations described by the ME, and physical limitations of standing and walking no more than 15 to 30 minutes at a time; no squatting, crouching, kneeling, crawling, balancing, or climbing stairs or ladders; lifting and carrying up to 15 pounds occasionally, and less than 10 pounds frequently, and no lifting off the floor.  (Tr. 429).  In response, the VE testified that she could not perform her past relevant work. However, she could perform sedentary unskilled work as an order clerk, of which there were 5,000 jobs statewide and 185,000 nationally; charge account clerk, of which there were 5,000 jobs statewide and 180,000 nationally, and information clerk, of which there were 3,000 jobs statewide and 100,000 nationally.  (Tr. 430).

**(20) The ALJ's Findings are Entitled to Deference**.  Claimant argues that: (1) her waiver of her statutory right to counsel was invalid, and that she was prejudiced by lack of counsel; (2) the ALJ failed to adequately set forth the basis for his adverse decision at Step 3, and her substantial rights were affected; (3) the ALJ's RFC assessment was not supported by substantial evidence, and (4) the ALJ erred in relying on the vocational expert's testimony.

19

As to the first argument, it is well established that the ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). When a claimant is not represented by counsel, the ALJ owes a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id.*, *citing Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). However, to merit reversal of the ALJ's decision, a claimant who does not validly waive his right to counsel must prove that he was thereby prejudiced. *Id.*; *Gullett v. Chater*, 973 F.Supp. 614, 621 (E.D. Texas 1997).

In support of claimant's argument that she did not validly waive the right to counsel, claimant cites HALLEX I-2-652, which provides as follows:

> The ALJ will open the hearing with a brief statement explaining how the hearing will be conducted, the procedural history of the case, and the issues involved. In supplemental hearings, the ALJ need only identify the case, state the purpose of the supplemental hearing, and describe the issue(s) to be decided.
>
> Generally, the content and format of the opening statement are within the discretion of the ALJ. However, if the claimant is unrepresented, the ALJ must ensure that the claimant is capable of making an informed choice about representation. For example, the ALJ should ask an unrepresented claimant the following questions on the record:
>
> 1. Did you receive the hearing acknowledgment letter and its enclosure(s)? (If not, the ALJ will provide the claimant with a copy and the opportunity to read the letter.)
>
> 2. Do you understand the information contained in that letter concerning representation? (If not, the ALJ will explain the claimant's

20

options regarding representation, as outlined in the acknowledgment letter. Specifically, the ALJ will explain the availability of both free legal services and contingency representation as well as access to organizations that assist individuals in obtaining representation.

***

Once the ALJ has determined that the claimant is capable of making an informed choice, he or she will secure, on the record, the claimant's decision concerning representation. The ALJ will also enter into the record the acknowledgment letter and enclosure(s) sent to an unrepresented claimant only if the claimant elects to proceed pro se at the time of the hearing.

While HALLEX does not carry the authority of law, the Fifth Circuit has held that "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)).  The Fifth Circuit requires, however, a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such failure will be permitted to serve as the basis for relief from an ALJ's decision.  *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001). Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.  *Newton,* 209 F.3d at 458.

The record in this case establishes that the ALJ followed the requirements set forth in HALLEX I-2-6-52.  He gave a brief statement as to how the hearing would be conducted, the history of the case, and the issues involved; provided claimant with a waiver of her right to an attorney, which she signed, and explained her right to an attorney.  (Tr. 27, 408-09).  Additionally, while claimant argues that counsel would have obtained additional medical records, effectively cross-examined the VE about her limitations, and called corroborating witnesses to testify, she has not specifically shown how this additional evidence might have led to a different decision.  [rec. doc. 12, p. 7].

Next, claimant argues that the ALJ failed to mention listing 12.05 at Step 3 of his decision. [rec. doc. 12, p. 7].  However, § 12.05 deals with mental retardation. 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05.  No evidence exists that claimant had mental retardation.  In fact, the record reflects that claimant was a high school graduate who had completed a year of college, vocational school, and a CNA program.  (Tr. 360).  Thus, this argument lacks merit.

Claimant also asserts that the ALJ failed to discuss the multiple psychological evaluations and observations in the record, particularly as to the "B" criteria. [rec. doc. 12, p. 8].  However, a review of the decision reflects that the ALJ specifically discussed the "B" criteria, as well as the mental evaluations in the records.  (Tr. 15,

22

17, 18).  He observed that the record contained evidence which strongly suggested that claimant had exaggerated symptoms and limitations. (Tr. 18).  This is supported by the medical records.   (Tr. 332, 344, 355, 361, 405).   Thus, the ALJ's determination is entitled to deference.

Next, claimant argue that the ALJ mischaracterized sedentary work, and failed to identify how much sitting she would do.  [rec. doc. 12, p. 8].  Although the ALJ first stated in the caption that claimant had the RFC to perform a full range of sedentary work, he then stated in the next sentence that claimant could perform the full range of light work with these limitations: standing and walking 15-30 minutes at a time with a required break; alternating sitting and standing every 30-45 minutes; lifting/carrying 15 pounds occasionally, less than 10 pounds frequently; pushing/pulling 15 pounds occasionally, less than 10 pounds frequently; never climbing stairs, ropes, ladders, or scaffolding; never kneeling, crouching, or crawling, and, moderate limitations in understanding/remembering detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, and maintaining regular attendance.  (Tr. 16).  These limitations are supported by the FCE performed by Advanced Rehab Services (Tr. 343) and the Mental RFC by Dr. Hamill.  (Tr. 363-64).

Procedural perfection in administrative proceedings is not required.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Gaines v. Commissioner of Social Security*, 2009 WL 3074318 (W.D. La. Sep. 22, 2009) (Melançon, J.).  This court will not vacate a judgment unless the substantial rights of a party have been affected. *Id*.  Given the description, this was clearly a typographical error by the ALJ, and is harmless.

Finally, claimant argues that the hypothetical question posed by the ALJ to the VE did not reasonably incorporate the RFC determined by the ALJ.  Specifically, she argues that the VE was not told anything about the alternating sitting and standing every 30 to 45 minutes or maintaining regular attendance. [rec. doc. 12, p. 9]. However, a review of the transcript indicates that the ALJ did incorporate these limitations.  (Tr. 429).  As the ALJ's hypotheticals to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or her representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference.  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

24

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.   *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed January 5, 2010, at Lafayette, Louisiana.

C. Michael Hill

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

25